# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| JULIE A. SU, Acting Secretary of Labor, United States Department of Labor, | : | |
| | : | |
| Plaintiff, | : | **COMPLAINT** |
| | : | |
| v. | : | No. 24-CV-4789 |
| | : | |
| SMOOTHSTACK, INC., and BORIS KUIPER, | : | |
| | : | |
| Defendants. | : | |

## PRELIMINARY STATEMENT

1.      In brazen contravention of the Fair Labor Standard Act, Defendants Smoothstack, Inc. ("Smoothstack") and Boris Kuiper ("Kuiper") (collectively, "Defendants") engage in a scheme akin to modern-day indentured servitude that exploits the disparate bargaining power between Defendants and their employees and traps employees in their jobs. Defendants, who operate an information technology ("IT") staffing agency that promises training and IT jobs to new employees, use coercive contract provisions that bind employees to their jobs, extract huge sums from them if they depart Smoothstack, and prohibit workers from engaging in protected activity under the FLSA.

2.      The Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201, *et seq.* (the "FLSA" or the "Act"), was enacted by Congress to address "the unequal bargaining power as between employer and employee" and "to prevent private contracts . . . [that] endangered national health and efficiency." *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706-07 (1945); *see* 29 U.S.C. § 201. "Any custom or contract falling short of that basic policy, like an agreement to pay less than the minimum wage requirements, cannot be utilized to deprive employees of their statutory rights."

*Jewell Ridge Coal Corp. v. Local No. 6167, United Mine Workers of Am.*, 325 U.S. 161, 167 (1945). Indeed, the Supreme Court has repeatedly and long held that employees cannot waive their claims under the FLSA because "contracts tending to encourage violation of laws are void as contrary to public policy." *Brooklyn Sav. Bank*, 324 U.S. at 707.

3.      Defendants' scheme and egregious contract provisions that have been in effect since at least July 2021 (the "relevant time period") violate the FLSA in several ways. After working approximately two weeks for free for Defendants, Defendants require employees to sign contracts obligating them to complete 4,000 hours (approximately two years) of billable work for Defendants to continue employment with them and in order to retain their earned wages. When employees resign, are terminated for cause, or breach the terms of the agreements, Defendants demand employees pay up to nearly $30,000 for purported training costs, future lost profits, and Defendants' administrative expenses. Not only is the training repayment agreement provision ("TRAP") in flagrant disregard of the FLSA, which requires employers to pay wages free and clear, not provisionally or subject to kickbacks, the TRAP violates the FLSA's minimum wage and overtime provisions when it brings employees' wages below the federal minimum wage and overtime rate. Defendants have routinely and repeatedly made good on their threats, demanding from employees that they pay the TRAP amount upon termination, including bringing legal action against former employees. In many instances, the amount demanded from employees pursuant to the TRAP is far greater than the amount of wages the employees earned during their entire employment with Defendants.

4.      In addition, Defendants unlawfully restrict and chill employees from engaging in protected activity under the FLSA by threatening to impose a monetary penalty of nearly $30,000 and/or loss of employment if employees breach Defendants' overly broad non-disparagement,

non-disclosure, and confidentiality provisions. These broad contract provisions prohibit employees from speaking about the terms of their employment agreement, "employment related issues and grievances," their "pay rates," or speaking negatively about their work at Smoothstack, which on their face appear to prohibit speaking freely with the United States Department of Labor (the "Department of Labor").

5.      Defendants also require employees to inform Smoothstack first if they are contacted by a government investigator and prohibit them from providing any oral or written information to a government investigator unless compelled by law. Defendants' policy chills employees from speaking openly with the Department of Labor and interferes with the Department of Labor's ability to effectively investigate and enforce the FLSA, including speaking confidentially with witnesses.

6.      Even upon termination, Defendants continue to control the employees' ability to assert their FLSA rights. Leveraging the threat of enforcing the TRAP against employees who have not completed the 4,000-hour billable service requirement, Defendants compel employees to sign settlement or separation agreements with many unenforceable provisions, including unlawfully requiring them to waive their FLSA rights and limiting their ability to disclose FLSA violations to the Department of Labor.

7.      The provisions, policies, and practices described above run afoul of the FLSA, including by undermining the Department of Labor's statutory authority to investigate employers and gather information from employees.  These practices also  have a chilling effect on employees' ability to effectively vindicate their federal statutory rights, including speaking freely with investigators from the Department of Labor. These provisions plainly undermine effective enforcement of the FLSA, which "could  . . . only be expected if employees felt free to approach

officials with their grievances." *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292 (1960) ("fear of economic retaliation often operate to induce aggrieved employees quietly to accept substandard conditions").

8.      Accordingly, Plaintiff, Julie A. Su, Acting Secretary of Labor, United States Department of Labor ("Plaintiff" or the "Acting Secretary"), brings this action pursuant to Section 17 of the FLSA, 29 U.S.C. § 217, to enjoin Defendants' acts and practices that violate Sections 6, 7, 11(a), 11(c), 15(a)(2), and 15(a)(3) of the FLSA, 29 U.S.C. §§ 206, 207, 211(a), 211(c), 215(a)(2), and 215(a)(3), and to obtain other appropriate relief.

9.      Specifically, the Acting Secretary brings this action to enjoin Defendants from: (a) demanding kickbacks that bring employees' wages below the statutory requirements of the FLSA; and (b) using broad waiver, confidentiality, non-disparagement, and non-disclosure provisions in employment and separation agreements, and their policy requiring employees to inform Smoothstack of potential investigations or legal proceedings, all of which interfere with the Acting Secretary's investigative authority, actively dissuade employees from asserting their rights under the FLSA, and threaten to retaliate against employees who engage in protected activity under the FLSA.

## JURISDICTION AND VENUE

10.      Jurisdiction of this action is conferred upon the Court by Section 17 of the Act, 29 U.S.C. § 217, and by 28 U.S.C. §§ 1331 and 1345.

11.      Venue is proper in the Eastern District of New York because a substantial part of the events or omissions giving rise to the claims occurred in this District, including but not limited to Brooklyn, Queens, and Staten Island, New York. 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

### The Parties

12.     Plaintiff Julie A. Su, Acting Secretary of Labor, United States Department of Labor, is authorized to bring actions to restrain and enjoin violations of the minimum wage, overtime, recordkeeping, the investigative authority, and anti-retaliation provisions of the FLSA, and is the proper plaintiff in this action.

13.     Defendant Smoothstack Inc. is a corporation organized under the laws of Virginia, with its principal place of business at 8200 Greensboro Drive, #900, McLean, Virginia.

14.     During the relevant time period, Smoothstack has employed employees who reside throughout the United States and work remotely for Smoothstack from where they reside.

15.     During the relevant time period, Smoothstack has hired and employed numerous employees who reside in and work remotely from Brooklyn, Queens, Staten Island, Manhattan, and other locations in New York.

16.     Smoothstack is aware when it hires New York-based employees that they reside in New York and will work remotely from New York.

17.     Smoothstack communicates with its employees who work remotely from New York by e-mail and Microsoft Teams.

18.     Smoothstack's communications with its New York-based employees include communications concerning employees' pay rates (such as the applicable minimum wage rate in New York), their employment agreements, and/or separation agreements.

19.     Smoothstack knows that its communications with employees who reside in New York are received in New York and the effects of such communications are felt in New York.

20.     Smoothstack has regulated the employment of all persons employed by it and has acted directly and indirectly in its own interest in relation to its employees. Smoothstack is an employer of its employees within the meaning of Section 3(d) of the Act, 29 U.S.C. § 203(d).

21.     Defendant Boris Kuiper ("Kuiper"), an individual, is the Chief Operating Officer and Chief Financial Officer of Smoothstack.

22.     Kuiper resides in Rockville, Maryland.

23.     Kuiper is responsible for Smoothstack's financial operations and regulatory compliance.

24.     Together with the Chief Executive Officer and Chief Technology Officer, Kuiper developed Smoothstack's training framework.

25.     Kuiper oversees the managers delegated to handle human resources and recruitment, and has the authority to make final decisions concerning Smoothstack's employment policies, hiring and termination, onboarding, employee pay, the recruitment process, among other employment terms and conditions.

26.     Kuiper has the authority to and has threatened to file legal actions against employees when they have expressed a desire to resign from Smoothstack.

27.     In support of at least some of Smoothstack's legal actions filed against employees to enforce the TRAP, Kuiper has submitted an affidavit attesting to having personal knowledge of the facts related to: the training and/or employments agreements, including the TRAP, demands to employees to pay the TRAP, and the training program and costs.

28.     Kuiper has acted directly and indirectly in the interests of Smoothstack in relation to Smoothstack employees and has regulated the terms and conditions of Smoothstack's employment.

29.     Kuiper is an employer of Smoothstack's employees within the meaning of Section 3(d) of the Act, 29 U.S.C. § 203(d).

30.     Together, Smoothstack and Kuiper are employers of Smoothstack's employees within the meaning of the FLSA.

### Defendant Smoothstack is an Enterprise Engaged in Commerce

31.     Smoothstack's business activities, as described herein, are related and performed through unified operation or common control for a common business purpose and constitute an enterprise within the meaning of Section 3(r) of the Act, 29 U.S.C. § 203(r).

32.     At all times relevant to this Complaint, Smoothstack has had an annual gross volume of sales made or business done in an amount not less than $500,000.

33.     At all times relevant to this Complaint, Smoothstack has employed hundreds of employees, many of whom work remotely and reside outside of Virginia.

34.     Smoothstack's employees handle goods and materials, such as computers, that have been moved in or produced for commerce.

35.     Therefore, Defendants' employees have been employed in an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of Section 3(s)(1)(A) of the Act, 29 U.S.C. § 203(s)(1)(A).

### Smoothstack's Training Program

36.     Smoothstack is a staffing agency that recruits IT professionals at the beginning of their careers ("recruits") with promises to launch their careers with paid training and work assignments with Smoothstack's clients.

37.     To participate in Smoothstack's training program, applicants have to first pass a coding exam and then a candidate interview.

7

38.    Smoothstack's training program involves three stages (the "training program").

39.    When recruits are offered to participate in the first stage of the training program, Smoothstack's offer letter sets forth the three stages of the training program and the applicable rates of pay: (1) no compensation during the first 2-3 weeks (the "first stage"); (2) the applicable state minimum wage (based on where the employee resides) during the 12-14 week training period (the "second stage"); and (3) $60,000 to $70,000 annually once they are placed with a Smoothstack client (the "third stage").

40.    During the first stage of the training program, recruits attend mandatory online lectures and complete required assignments with demanding deadlines, and are evaluated by Smoothstack for participating in the second stage of the training program.

41.    During the second stage of the training program, employees are required to attend online presentations, lectures, and/or training sessions with Smoothstack trainers every weekday.

42.    In addition, Smoothstack assigns employees challenging and time-consuming assignments, which take many hours to complete. Smoothstack requires employees to complete these assignments on short deadlines, some with next-day turnaround and others that must be completed over a weekend.

43.    Employees are not able to attend lectures and trainings and complete their time-consuming assignments within 40 hours in a workweek.

44.    Accordingly, during the relevant time period, many employees have regularly worked over 40 hours, and as many as 84 hours or more per week during the second stage of the training program.

45.    Defendants know or have reason to believe that employees regularly work over 40 hours in a week to complete their work during the relevant time period.

8

46.     Yet Smoothstack instructs employees not to record hours worked over 40 in a workweek during the second stage of the training program.

47.     Thus, during the second stage of the training program, Defendants fail to maintain accurate time records of hours worked over 40 in a workweek.

48.     Further, Defendants failed to maintain time records of hours worked by employees during the second stage of the training program for most of 2021.

### The Training Program Primarily Benefits Defendants

49.     The training employees purportedly receive and tasks performed by employees primarily benefit Defendants.

50.     Defendants tailor employees' training to Smoothstack's specific client requirements, rather than providing training that is transferable to other programs.

51.     For example, Defendants mandate employees to change the focus of their software programming skills mid-way through the training if it is necessary to meet the specific needs of a prospective Smoothstack client.

52.     Defendants also primarily benefit from the training program because employees research and prepare pitches to potential Smoothstack clients.

53.     Further, during the training program, Smoothstack directs some employees purportedly receiving training themselves to train other employees.

54.     The training is not for the purpose of obtaining a specialized license.

### Smoothstack's Employment Agreements

55.     During the relevant time period, Smoothstack has required its employees to sign various types of employment agreements as a condition of employment.

9

56.     These agreements include an offer letter for paid full-time employment, which employees receive at the beginning of the first stage of the training program, along with a training agreement and/or employment agreement. For the purposes of this complaint, these agreements will be collectively referred to as "employment agreements."

### The TRAP

57.     Smoothstack's offer letter to participate in the first stage of the training program informs recruits about the two-year commitment on client projects, but there is no mention of the TRAP.

58.     After recruits invest two weeks of their time without any compensation during the first stage of the training program, Defendants require recruits who receive an offer of paid full-time employment to sign an agreement with a TRAP in order to participate in the second stage of the training program.

59.     However, Defendants do not disclose the TRAP in the offer letter that employees are required to sign to accept their offer of full-time paid employment.

60.     Only after employees have accepted the offer do Defendants disclose the TRAP in subsequent employment agreements.

61.     The amount owed under the TRAP ranges between approximately $23,895 and $29,895, with older employment agreements (in effect during the relevant time period) in the lower end of the range and more recent agreements at the high end of the range.

62.     The TRAP is triggered if an employee resigns or is terminated for cause (e.g., for "poor performance," "violation of a Smoothstack or Client policy," "disclosure of Smoothstack or Client trade secret or confidential information," or "job abandonment") before they have fulfilled their 4,000 billable hours commitment period, or if they breach any other terms of the agreement.

63.    The service commitment period is 4,000 billable hours with a Smoothstack client. Thus, the hours worked during the first and second stages of the training period do not count towards the service commitment period.

64.    The TRAP, which Smoothstack refers to as a liquidated damages clause, requires repayment of costs and expenses that are far broader than training costs, including but not limited to future lost profits and other damages.

65.    Further, the costs and expenses the TRAP purportedly covers are primarily for the benefit of the employer.

66.    For example, the TRAP includes Defendants' expenses, such as "background checks, curriculum development, proprietary agile training in an enterprise environment, use of paid systems and tools, resume building, interview preparation, client marketing, training, and bench pay, client onboarding coordination, relocation cost, Employee progress tracking, [and] program administration."

67.    The TRAP also covers "damages, including the cost to train replacements, the cost associated with interruption of work on a project, loss of goodwill, and potentially, loss of income generating profits."

68.    In lawsuits against employees to enforce the TRAP, Smoothstack has represented to the court that Smoothstack uses the TRAP to recover future lost profits when an employee does not complete the service commitment period.

69.    Further, as described in paragraphs 49 through 54, the training that employees purportedly receive from Smoothstack primarily benefits Smoothstack.

70.     In the employment agreements, separate from the TRAP, Smoothstack imposes additional costs on employees, including reimbursing Smoothstack for costs, expenses, and attorneys' fees incurred by Smoothstack for enforcing the terms of the agreement if it prevails.

71.     Defendants' routine enforcement of the TRAP makes clear that the TRAP subverts the FLSA's Sections 6 and 7 minimum wage and overtime requirements, respectively, when employees' wage rates effectively fall below the statutory requirements.

72.     For example, in December 2022, Smoothstack sued a former employee ("Employee 1") in Fairfax County General District Court in Virginia for a warrant in debt of the TRAP amount and obtained a judgment of $25,000 plus costs and post-judgment interest against the employee.

73.     According to Smoothstack's records, Defendants employed Employee 1 for just three months from June 2022 through September 2022.

74.     According to Smoothstack's records, Defendants paid Employee 1 $9.87 per hour, for a total of $5,448.24 in gross wages during Employee 1's entire period of employment with Defendants.

75.     In Employee 1's last week of work for Defendants, for the workweek beginning September 19, 2022, Defendants paid Employee 1 $315.84 in gross wages for 32 hours of work, according to Smoothstack's records.

76.     Thus, the TRAP of $25,000 plus costs and post-judgment interest effectively brought Employee 1's wages—whether from their final workweek or from their entire period of employment with Defendants—to below $0.

77.     Indeed, Defendants sought to *earn* nearly $20,000 from Employee 1's departure.

78. As another example, Smoothstack filed a warrant in debt against another former employee ("Employee 2") in Fairfax County General District Court in Virginia for $23,895 plus attorneys' fees and costs.

79. According to Smoothstack's records, Defendants employed Employee 2 from approximately June 2021 to December 2021.

80. According to Smoothstack's records, Defendants paid Employee 2 $7.25 per hour, for a total of $7,250.00 in gross wages during Employee 2's entire period of employment with Defendants.

81. In Employee 2's last week of work for Defendants, for the workweek beginning December 6, 2021, Defendants paid Employee 2 $290.00 in gross wages for 40 hours of work, according to Smoothstack's records.

82. Thus, Defendants' demand for $23,895 plus attorneys' fees and costs effectively brought Employee 2's wages—whether from their final workweek or from their entire period of employment with Defendants—to below $0.

83. Here, Defendants sought to *earn* over $16,500 from Employee 2's departure.

84. In addition to filing enforcement actions against former employees in court, Defendants have demanded that multiple employees pay the TRAP amount when they have resigned, including sending demand letters and threatening to sue employees.

85. Even when Defendants have not enforced the full amount of the TRAP, they have still leveraged the TRAP by pressuring employees to pay a substantial monetary amount to Smoothstack.

86. For example, according to Smoothstack's records, at the end of another employee's ("Employee 3") employment with Defendants, Smoothstack demanded $10,000 from Employee

3, which led Employee 3 to sign a settlement agreement to pay $10,000 to Smoothstack on or around February 14, 2023.

87.    According to Smoothstack's records, Defendants employed Employee 3 from approximately January 2023 to February 2023.

88.    According to Smoothstack's records, Defendants paid Employee 3 $7.25 per hour, for a total of $928.00 in gross wages during Employee 3's entire period of employment with Defendants.

89.    In Employee 3's last week of work for Defendants, for the workweek beginning February 13, 2023, Defendants paid Employee 3 $58.00 in gross wages for 8 hours of work, according to Smoothstack's records.

90.    Thus, Defendants' demand for $10,000 effectively brought Employee 3's wages—whether from their final workweek or from their entire period of employment with Defendants—to below $0.

91.    Here, Defendants sought to *earn* over $9,000 from Employee 3's departure.

92.    Further, some employees, for whom Defendants have demanded to pay the TRAP amount or another substantial monetary amount, worked over 40 hours, and as many as 84 hours, in workweeks, including their last workweek, leading up to Defendants' enforcement of the TRAP during the relevant time period.

93.    Accordingly, when the amount owed under the TRAP is triggered by an employee resigning, being terminated for cause, or breaching the agreement before meeting the 4,000 billable hour service requirement, Defendants violate the FLSA when the amount of the TRAP and/or additional costs Defendants intend to seek against employees bring the employees' wages below the minimum wage.

14

94.     Similarly, when the amount owed under the TRAP is triggered by an employee resigning, being terminated for cause, or breaching the agreement before meeting the 4,000 billable hour service requirement, Defendants violate the FLSA's overtime provision when the amount of the TRAP and/or additional costs Defendants intend to seek against employees bring the employees' wages below what they should have been lawfully paid during overtime workweeks.

### *Confidentiality, Non-Disparagement, and Non-Disclosure Provisions in Employment Agreements*

95.     The employment agreements that have been in effect during the relevant period have broad confidentiality, non-disparagement, and/or non-disclosure provisions, and make explicit that the employee owes the TRAP amount if they breach any provision of the agreement.

96.     While the confidentiality, non-disparagement, and non-disclosure provisions have changed somewhat over time during the relevant time period, the employment agreements have consistently included such provisions that are overbroad and have a chilling effect on workers exercising their right to report or speak with the Department of Labor.

97.     On the face of the confidentiality provisions, employees are not permitted to disclose the terms of the agreement to the Department of Labor absent a subpoena.

98.     For example, the confidentiality provisions require employees to "not directly or indirectly disclose or publish the terms of [the] agreement, except to immediate family, Employee's attorney, or as required by law."

99.     Accordingly, employees may reasonably believe that they cannot disclose the terms of the agreements to the Department of Labor absent a subpoena or court order.

100.    Likewise, Defendants require employees to accede to broad non-disparagement and non-disclosure provisions which effectively bar employees from bringing complaints to the Department.

101.    For example, the non-disparagement provision in one of the employment agreements in effect during the relevant time period states, "[T]he Employee shall not make any statement concerning the Company, its affiliates, or any of its officers, directors, shareholders, or employees unless such statement is previously approved by the Company, required by law, or primarily personal publicity issued by Employee that includes incidental, non-derogatory reference to the Company, its affiliates, or Employee's employment thereby."

102.    As another example, the non-disclosure provision in a previous employment agreement that has been in effect during the relevant time period includes a non-disclosure provision requiring employees to agree that they "will not, directly or indirectly, divulge, reveal, report, publish, transfer, or disclose to any person or entity any of the Company's Confidential and Proprietary Information," which is broadly defined to include, for example, "business operations, internal structure, financial affairs." That non-disclosure provision also prohibits employees from "discuss[ing] any employment related issues and grievances, or disclos[ing] their pay rates" with clients or other employees.

103.    The confidentiality, non-disparagement, and non-disclosure provisions impermissibly restrict employees' ability to speak freely with the Department of Labor or otherwise file complaints or assert claims regarding potential FLSA violations by Smoothstack.

104.    Coupled with the threat of the TRAP and termination for breaching the terms of the agreement, a reasonable employee would likely fear reporting or filing complaints and speaking freely with Department of Labor investigators.

105.    The threat of termination and monetary damages is intended dissuade employees from speaking freely with Department of Labor investigators.

106.    Further, Defendants' actual enforcement of the TRAP against multiple employees has sent the message to workers that Smoothstack will enforce the terms in its agreements, further chilling employees who may want to report potential FLSA violations or otherwise assert their rights under the FLSA.

### *Waiver Provision in Employment Agreements*

107.    The employment agreements require employees to authorize Smoothstack to deduct "any final pay owing . . . of any amount calculated to be owed under this Agreement."

108.    Requiring employees to authorize Smoothstack to deduct any amount owing under the Agreement from their final pay effectively constitutes a requirement that employees agree to waive their right to minimum wage and overtime pay under the FLSA.  As deducting the TRAP amount from an employee's final pay would reduce that employee's final pay to $0, this violates the FLSA's minimum wage requirement, and if in an overtime workweek, the overtime requirements.

### **Smoothstack's Employee Handbook**

109.    Smoothstack prohibits employees from sharing the contents of its employee handbook, which states that "all of its content is confidential and cannot be disclosed to anyone not an employee of Smoothstack."

110.    The employee handbook, which has been in effect during the relevant time period, further states that "[d]eparting employees remain bound by the confidentiality requirement."

111.    Some of Smoothstack's employment agreements that have been effect during the relevant time period reference and require employees to "abide by . . . all employment policies and practices . . . in the Employee Handbook."

17

112.    Smoothstack's employee handbook that has been in effect during the relevant time period includes a section referred to as "Responding to Legal Proceedings," which requires employees to immediately notify Smoothstack if they are contacted by a government investigator.

113.    Specifically, it states: "Your supervisor and HR must be notified immediately if you are contacted by a Government investigator or auditor or if you are notified of any lawsuit, investigation, inquiry, subpoena, or legal proceeding in which Smoothstack is or might be involved. This includes situations where an employee is involved as a third party (e.g. as a witness) if the matter concerns Smoothstack."

114.    The employee handbook further prohibits employees from providing "information, whether oral or written, or records or files of any nature . . . to any outside party in connection with a lawsuit or Government investigation unless compelled by law, and even in such case any employee that feels they are compelled to disclose such information, records, or files should inform Smoothstack immediately so that Smoothstack can determine whether to seek proper relief from such disclosure."

115.    Requiring employees to inform Smoothstack of communications from a government investigator plainly interferes with the Acting Secretary's authority to conduct an investigation and effectively enforce the FLSA, including speaking confidentially with employees.

116.    The FLSA's enforcement mechanism relies in large part on workers feeling able to come forward and speak freely with investigators or otherwise complain about potential violations. Accordingly, to effectively enforce the FLSA, the Acting Secretary depends on workers feeling able to speak freely with investigators.

117.    Requiring employees to inform Smoothstack of communications from a government investigator is also inherently coercive, particularly in light of the unequal

18

employment relationship between Smoothstack and its employees, and chills employees from participating in investigations conducted by the Department of Labor.

118.   Prohibiting employees from speaking with a government investigator, and making an exception only if the employee is compelled to do so by law, interferes with the Acting Secretary's authority to conduct an investigation and effectively enforce the FLSA.

119.   Prohibiting employees from speaking with a government investigator would likely dissuade employees from engaging in protected activity, including filing a complaint and speaking freely with Department of Labor investigators.

120.   The threat of termination and/or having to pay a monetary penalty to Smoothstack further chills employees from engaging in such protected activity.

### Smoothstack's Separation Agreements

121.   When employees want to resign from or are terminated by Smoothstack, Smoothstack has leveraged its employment agreements and rigorous enforcement of the TRAP to compel employees to sign settlement or separation agreements (collectively referred to hereafter as "separation agreements") with broad general releases and additional non-disclosure, non-disparagement, and confidentiality provisions.

122.   Further, the separation agreements include a liquidated damages amount up to nearly $30,000 to prevent employees from exercising their rights under the FLSA and other statutes.

### *Waiver Provision in Separation Agreements*

123.   The separation agreements that have been in effect during the relevant time period contain broad general releases where employees purport to waive their rights under many statutes, including the FLSA.

124. Although there are some exclusions in the waiver provision allowing participation in a government investigation in some of the separation agreements, Defendants still require employees to "waive[] any right to monetary relief related to any filed charge or administrative complaint" or "waive [their] right to . . . reinstatement" resulting from a government investigation.

125. In the separation agreements, Smoothstack also requires employees to affirm that they "have been paid and/or have received all compensation, wages, bonuses, and/or benefits . . . and no other compensation, bonuses and/or benefits are due to you."

126. Similarly, in the separation agreements, Smoothstack requires employees affirm that they "have not filed, have not caused to be filed, and are not present party to any claim, complaint, or action against Smoothstack . . ."

127. By being misled about their rights under the FLSA and believing that they have waived their right to back wages resulting from an investigation, employees are dissuaded from approaching or speaking with the Department of Labor even if the waiver provision does not prohibit it.

128. Although the Supreme Court has repeatedly held that FLSA waivers are unenforceable, the waiver provision nevertheless chills employees, who may be unaware that these waivers are unenforceable, from making FLSA complaints to the Department of Labor or otherwise attempting to vindicate their FLSA rights.

### *Confidentiality, Non-Disparagement, and Non-Disclosure Provisions in Separation Agreements*

129. Smoothstack's separation agreements that have been in effect during the relevant time period contain confidentiality, non-disclosure, and non-disparagement provisions that chill current and former employees' assertion of their rights under the FLSA, including speaking with the Department of Labor.

20

130.    Although the separation agreements contain more explicit exceptions for speaking with the government than the employment agreements, there is still a chilling effect because it is unclear what a former employee is permitted to disclose under the separation agreement, particularly as the employment agreements state that the confidentiality provisions continue to apply after termination.

131.    Some of the provisions are also phrased such that they prohibit a former employee from affirmatively contacting or communicating with a government investigator.

132.    For example, one of the separation agreements requires that all terms of the agreement be kept confidential, including amounts. While some separation agreements exclude "any government officials who seek such information," the former employee is required to only say, "The matter has been resolved" if asked.

133.    In the same paragraph that includes the confidentiality terms, the separation agreement threatens $10,000 in a liquidated damages provision if violated.

134.    In recent separation agreements, the liquidated damages amount imposed for breaching the confidentiality terms is $29,895—the same amount of the TRAP reflected in recent employment agreements. There is also no government carve out for disclosing the terms of the agreement to the government.

135.    As to the prohibition on disclosing information learned during the course of employment, there is a very narrow exception that states, "[N]othing in this Agreement shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency."

21

136.    Thus, even with the very narrow exception, former employees are still prohibited from affirmatively contacting, communicating with, or freely approaching the Department of Labor.

137.    The non-disparagement provision in the separation agreement serves as another restriction on former employees' ability to assert their rights and speak freely with the Department of Labor. It prohibits a former employee from "mak[ing] or caus[ing] to be made any statements (oral or written) to anyone regarding [Smoothstack] which are defamatory, disparaging, or are intended to or have the effect of harming [Smoothstack's] reputation."

138.    The confidentiality, non-disclosure, and non-disparagement provisions in the separation agreements restrict and discourage former employees from speaking freely with the Department of Labor.

### The Department of Labor's Ongoing Investigation

139.    The Department of Labor's Wage and Hour Division has an ongoing FLSA investigation of Smoothstack.

140.    The Department of Labor's ability to investigate depends on its ability to freely speak with employees and for employees to feel free to confidentially approach investigators with grievances.

141.    Smoothstack's waiver, non-disclosure, confidentiality, and non-disparagement provisions in the employment and/or separation agreements with current and former employees hinder the Department of Labor's ability to conduct its investigation.

142.    Smoothstack's employee handbook provision requiring employees to immediately inform Smoothstack if an investigator contacts the employee also hinders the Department of Labor's ability to conduct its investigation.

22

143.     Similarly, the employee handbook provision prohibiting employees from providing information to a government investigator absent being compelled by law interferes with the Department of Labor's ability to conduct its investigation.

144.     The terms of Smoothstack's employment and separation agreements and the employee handbook prohibit current and former employees from volunteering information to the Department of Labor, and prevent confidential communications between current and former employees and the Department of Labor.

145.     The employment and separation agreements' effect of dissuading current and former employees from speaking with the Department of Labor is particularly acute here, where employees fear termination and/or enforcement of the TRAP or liquidated damages provision if they violate the terms of the agreements.

146.     The hindering effect on the Department of Labor's investigation is not merely hypothetical. In the course of its investigation, the Department of Labor has in fact had difficulty communicating with Smoothstack's current and/or former employees. For example, multiple former Smoothstack employees, including at least one residing in New York, expressed fear of retribution by Smoothstack as their reason for not wanting to participate in the Department of Labor's investigation.

### Defendants' Actions are Willful

147.     As is evident in Defendants' payroll records and employee handbook, Defendants are well aware of their obligations under the FLSA.

148.     Defendants' instruction not to report hours worked over 40 is willful.

149.     Defendants are also well aware that the TRAP payment amount represents costs and expenses that do not primarily benefit employees, but continue to demand and enforce the

23

terms of the TRAP against employees, bringing employees' wages below the statutory requirements under the FLSA.

150.    Defendants have also demanded or enforced the TRAP against employees when they know that the amount they are demanding far exceeds the costs of training and undercut the wages the employees are entitled to under the FLSA.

151.    Accordingly, Defendants have willfully violated the provisions of the FLSA as alleged above.

**FIRST CAUSE OF ACTION**
**Violation of 29 U.S.C.§§ 206(a), 215(a)(2) of the FLSA**
<u>**Failure to Pay Minimum Wage**</u>

152.    The Acting Secretary incorporates by reference and re-alleges the allegations in paragraphs 1 through 151 as if fully set forth at length.

153.    Defendants have willfully violated and are continuing to violate Sections 6 and 15(a)(2) of the Act.

154.    Defendants' imposition of the TRAP (and related costs to enforce the TRAP) on employees is an illegal request that employees kick back wages to Smoothstack when the TRAP brings employees' pay below the FLSA minimum wage for one or more workweeks and/or is a failure to pay employees, finally and unconditionally or free and clear, at least the minimum wage guaranteed by the Act for all hours worked.

155.    Therefore, the Acting Secretary seeks to enjoin these unlawful practices under Section 17 of the Act.

## SECOND CAUSE OF ACTION
### Violation of 29 U.S.C. §§ 207 and 215(a)(2) of the FLSA
#### Failure to Pay Overtime

156.     The Acting Secretary incorporates by reference and re-alleges the allegations in paragraphs 1 through 151 as if fully set forth at length.

157.     Defendants have willfully violated and are continuing to violate Sections 7 and 15(a)(2) of the Act.

158.     Defendants' imposition of a TRAP (and related costs to enforce the TRAP) on employees is an illegal request that employees kick back wages to Smoothstack when the TRAP brings employees' pay below the required overtime compensation of one and one-half times their regular rate of pay for one or more workweeks in which they worked over 40 hours and/or is a failure to pay employees, finally and unconditionally or free and clear, the wages required by the Act for all hours worked in overtime workweeks.

159.     Therefore, the Acting Secretary seeks to enjoin these unlawful practices under Section 17 of the Act.

## THIRD CAUSE OF ACTION
### Violation of 29 U.S.C. § 215(a)(3) of the FLSA
#### Retaliation

160.     The Acting Secretary incorporates by reference and re-alleges the allegations in paragraphs 1 through 151 as if fully set forth at length.

161.     As a result of Defendants' waiver, confidentiality, non-disclosure, and non-disparagement provisions, coupled with the threat of termination or a significant monetary fee, a reasonable employee would be dissuaded from engaging, or preparing to engage, in activity that is protected by the Act, such as speaking freely to the Department of Labor's investigators, participating in the Department of Labor's investigation, filing a complaint, obtaining back wages

25

due as part of an investigation, or otherwise asserting or complaining about their rights under the FLSA.

162. The threat of termination and monetary damages is intended dissuade current and former employees from speaking freely with Department of Labor investigators.

163. Defendants' intent to dissuade employees from speaking freely with Department of Labor investigators or otherwise engaging in protected activity under the FLSA is evident in, for example, Smoothstack's requirement that employees immediately inform supervisors when employees are contacted by a government investigator and its prohibition against providing information to a government investigator.

164. Defendants' requirement that employees immediately inform supervisors when employees are contacted by a government investigator and their prohibition against employees providing information to a government investigator, coupled with the threat of termination or a significant monetary fee, further dissuade employees from engaging, or preparing to engage, in activity that is protected by the Act, such as speaking freely to the Department of Labor's investigators, participating in the Department of Labor's investigation, filing a complaint, obtaining back wages due as part of an investigation, or otherwise asserting or complaining about their rights under the FLSA.

165. By engaging in the conduct set forth in this Complaint, Defendants have willfully violated and are continuing to violate Section 15(a)(3) of the Act, 29 U.S.C. § 215(a)(3), by retaliating against current and former employees for engaging in or preparing to engage in activity that is protected by the FLSA.

26

## FOURTH CAUSE OF ACTION
### Violation of 29 U.S.C. § 211(a) of the FLSA
### Interference of the Acting Secretary's Investigation

166. The Acting Secretary incorporates by reference and re-alleges the allegations in paragraphs 1 through 151 as if fully set forth at length.

167. Defendants' waiver, confidentiality, non-disclosure, and non-disparagement provisions, their requirement to immediately report to Smoothstack when employees are contacted by a government investigator, and prohibition against providing information to a government investigator interfere with the Acting Secretary's authority to effectively enforce the FLSA. These provisions and policies prevent, dissuade, and chill current and former employees from speaking freely with the Department of Labor's investigators.

168. Therefore, Defendants have violated and are continuing to violate Section 11(a) of the FLSA, 29 U.S.C. § 211.

## FIFTH CAUSE OF ACTION
### Violation of 29 U.S.C. § 211(c)
### Failure to Keep Accurate Records

169. The Acting Secretary incorporates by reference and re-alleges the allegations in paragraphs 1 through 151 as if fully set forth at length.

170. Defendants have willfully violated and are continuing to violate the provisions of Sections 11(c) and 15(a)(5) of the Act, in that Defendants failed to make, keep, and preserve adequate and accurate records of their employees' hours as prescribed by the regulations issued and found at 29 C.F.R. 516.2.

### PRAYER FOR RELIEF

WHEREFORE, cause having been shown, the Acting Secretary respectfully requests that this Court enter judgment against Defendants providing the following relief:

(1)     A declaration that it violates the FLSA for Defendants to: (a) demand, threaten, attempt to contractually obligate or enforce, or otherwise require, employees or former employees to pay to Defendants costs that Defendants are prohibited from shifting to employees, including but not limited to marketing, onboarding, loss of future profits, attorneys' fees, and other administrative costs, such that the payment to Defendants would reduce employees' wages below the levels required by the FLSA; (b) seek waivers of the FLSA from their current or former employees; (c) use confidentiality, non-disparagement, or non-disclosure provisions that would chill a reasonable employee for asserting their rights under the FLSA, including speaking freely with the Department's investigators, filing a complaint, or otherwise asserting their rights; (d) require employees to inform Smoothstack about government and other legal inquiries pertaining to the FLSA; and (e) prohibit employees from providing information to the Department's investigators.

(2)     An injunction issued pursuant to Section 17 of the Act permanently enjoining and restraining Defendants, their officers, agents, servants, employees, and those persons in active concert or participation with Defendants who receive actual notice of any such judgment, from violating the provisions of Sections 6(a), 7, 11(a), 11(c), 15(a)(2), and 15(a)(3) of the Act, including by doing or attempting any of the following: requiring, obligating, threatening, demanding, or enforcing contractual terms or policies that: (a) current or former employees pay to Defendants costs that Defendants are prohibited from shifting to employees, including but not limited to marketing, onboarding, loss of future profits, attorneys' fees, and other administrative costs, that would reduce employees' wages below the levels required by the FLSA; (b) current or former employees waive their rights under the FLSA; (c) prohibit, discourage, dissuade, or chill current or former employees from speaking freely with the Department of Labor, filing a complaint

28

under the FLSA, or otherwise assert their rights under the FLSA; and (d) interfere with the Department's enforcement of the FLSA.

(3)     Pursuant to Section 15(a)(3) of the Act, all additional injunctive relief as may be appropriate to effectuate the purposes of Section 15(a)(3).

(4)     An Order requiring Defendants to inform its employees that it will not retaliate against current or former employees who speak to representatives of the Department of Labor and that current and former employees are free to provide information to the Department of Labor without notifying Defendants;

(5)     An Order compelling Defendants to reimburse the Acting Secretary for the costs of this action; and

(6)     An Order granting such other relief as the Court may deem necessary or appropriate.

Dated: July 10, 2024

Respectfully submitted,

SEEMA NANDA
Solicitor of Labor

JEFFREY S. ROGOFF
Regional Solicitor

/s/ Amy Tai
AMY TAI
Senior Trial Attorney

U.S. DEPARTMENT OF LABOR
Office of the Regional Solicitor
201 Varick Street, Room 983
New York, NY 10014
(646) 264-3653
tai.amy@dol.gov
NY-SOL-ECF@dol.gov

*Attorneys for Plaintiff Acting Secretary of Labor Julie A. Su*